## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | **Criminal Action No.** |
| vs. | § | **3:20-CR-435-E** |
| | § | |
| ANTONIO DESHUN PICKETT | § | |

### FINDINGS, CONCLUSIONS AND RECOMMENDATION

By electronic order of reference dated May 26, 2021 (doc. 26), before the Court is the defendant's *Motion to Suppress Evidence and Request for Evidentiary Hearing*, filed May 10, 2021 (doc. 24). Based on the relevant filings, evidence, oral argument, and applicable law, the motion for a hearing is **GRANTED**, and the motion to suppress should be **DENIED**.

### I.  BACKGROUND

On September 22, 2020, Antonio Deshunn Pickett (Defendant) was charged by indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*See* doc. 1.) At his initial appearance on a writ of habeas corpus *ad prosequendum* on December 18, 2020, he was appointed counsel and ordered detained after he waived his right to a detention hearing. (*See* docs. 6, 8, 10, 12, 13.) He was also arraigned and entered a plea of not guilty. (*See* doc. 13.) By *Pretrial Order* dated December 21, 2020, trial was set for February 22, 2021. (*See* doc. 14.) Defendant subsequently requested and obtained a continuance of the trial date, and the trial was continued until May 24, 2021. (*See* docs. 16, 17.) On April 12, 2021, he moved for another continuance of the trial date; his unopposed motion was granted, and the trial was scheduled for September 7, 2021. (*See* docs. 22, 23.)

Defendant moved to suppress the firearm he is charged with possessing and for an evidentiary hearing on May 10, 2021. (*See* doc. 24.) The government filed a response on May 24,

2021, and an evidentiary hearing was conducted on June 17, 2021.  (*See* docs. 25, 29.)  At the beginning of the hearing, the government conceded that it was warranted.

A.    **Testimony**

An Irving Police Department officer (Officer) testified that around 12:45 a.m. on the night of August 12, 2020, he was patrolling the area near a hotel in Irving, Texas.  Officer had been with the department for eight years, and he also had four and a half years of prior law enforcement experience with the Border Patrol.  A lot of illegal activity was known to occur in that area, including "drugs, guns, warrants, prostitution, [and] stolen vehicles."  He patrolled that location multiple times per week, if not nightly, and he made drug arrests of persons leaving the hotel. Typically, the persons he arrested arrived at the parking lot and then left five or ten minutes later, and they had methamphetamine, marihuana or heroin in their vehicles when they were subsequently stopped.  Officer saw a maroon Impala, arrive at the hotel and then leave five or ten minutes later. He did not remember whether he saw who was in the vehicle, but he did not observe any illicit or criminal behavior, such as a hand-to-hand transaction, a firearm flash, or prostitutes at the window of the vehicle.  He followed the Impala out of the hotel parking lot and ran the license plate.[1]  The Impala was not driving erratically in any way.  After he learned that the registration was expired and there was no insurance on the vehicle, and he observed a traffic violation, Officer initiated a traffic stop.  The Impala pulled into a business parking lot in an area that is "harder to get to," so he may have called for back-up.

When Officer stopped, got out of his vehicle and approached the Impala, his in-car camera

---

[1]Comparison of the Incident Report, which was admitted without objection as Defendant's Exhibit 1, and the Incident Detail Report, which was admitted without objection as Defendant's Exhibit 2, shows that Officer apparently mistyped the license plate number into the computer, although he did not realize it at the time. The number he actually typed in came back to a different type of vehicle.

was already recording, but it records only the sound heard inside his vehicle.  His body camera was also recording, although the sound recording does not begin for about 30 seconds because of the way the system is designed.[2]  The first minute and 10 seconds of the body camera video shows Officer getting registration information from his in-car computer.  He then made contact with the Impala's driver, Defendant. Defendant avoided making eye contact with him, which Officer thought was unusual.  A spotlight from his police car was aimed towards the Impala and was reflected in the Impala's rear view mirrors.  There were two other passengers in the vehicle.  Although Officer was watching the whole scene, he was watching Defendant primarily.

Officer explained the reasons for the stop, including the registration, insurance and traffic violation.  Defendant's hands were visible.  After Officer asked for identification, Defendant turned to his right side to get it from his wallet, which was in a bag sitting right next to him, in a manner that Officer interpreted as unusual and "maybe trying to keep it out of my view."  Officer noted that persons often put their wallets or purses in their lap to look for their identification.  For example, the front seat passenger, Defendant's visibly pregnant wife, picked her purse up from the floorboard and put it on her lap to get her identification.  Officer conceded that her pregnancy might have made it difficult for her to lean and search the purse while it was on the floorboard.  After retrieving his wallet from the bag, Defendant turned toward the front with his wallet in front of him.  He then he turned towards Officer, pulled his identification card from the wallet, and handed it to Officer. Defendant did not have a driver's license, only an identification card; it is common for persons with suspended licenses to only provide an identification card when stopped while driving a car. Defendant then closed his wallet, shifted back over to the right, placed it in the bag next to him, and

---

[2]Officer's body camera footage was admitted into evidence without objection as Government's Exhibit 1.

turned to face Officer.

Defendant was fidgeting with his beard a lot and looking back and forth, which indicated nervousness to Officer. He was also sort of "leaning out of the window" and "blading" his body by turning it away from the vehicle, but not in a manner that was aggressive. Officer noted that most of the time, people just sit still generally, and that one reason for blading could be to block view of something. Officer could see Defendant's arm almost flexing, and then he got a cigarette, which Officer also interpreted as nervousness, based on his experience. Officer conceded on cross-examination that nervousness would also be consistent with a police encounter, and that he could understand that a black man might go above and beyond to keep his hands in view during a police encounter. Defendant's hands remained in plain view for the most part. Officer asked Defendant a question, and Defendant responded with what Officer recognized as nervous laughter, based on his training and experience. Officer had difficulty hearing Defendant's answers at times, as well as his wife's answers, and Defendant relayed them to Officer. Based on Defendant's behaviors, and especially with the way his body was positioned and "not very relaxed," Officer believed that Defendant was concealing something which could possibly be a weapon, so he decided to get Defendant out of the vehicle for safety reasons. A back-up officer arrived at that point, and Officer told Defendant that he could step out of the vehicle shortly and light his cigarette.

When Defendant opened the door to get out of his vehicle, he asked Officer if he could put it in park, and Officer found it a little unusual that the car was not already in park. Instead of getting out, Defendant then "kind of went to his right" in the seat in a manner that seemed unusual to Officer and "definitely got [his] attention," and Officer continued to believe that Defendant was trying to conceal something in that area. Officer did not note the motion in the incident report. The

4

area was industrial and not populated.  Defendant was reaching into his pocket, and Officer was concerned he was going to run.  He asked Defendant to come to the back of his vehicle.  There was "some hesitation" and he tensed up, so Officer decided to place Defendant in handcuffs.  After he asked Defendant a couple of times to go to the back of the car, Officer tried to move or "escort" him by touching him on the arms.  While this was happening, Defendant had his hands up in front of him, where they were visible.

Officer began cuffing Defendant, stating that it was because he kept reaching in his pocket after being told not to, although Officer had not told him to stop reaching in his pockets before he cuffed him.  He told Defendant not to pull away because "[i]t won't work out good for you, I promise."  Defendant apologized.  Officer searched Defendant for weapons and found none; Defendant did not resist the search.  Defendant asked if he could smoke, and Officer got his lighter for him.

Officer asked Defendant what he was doing in the area, and Defendant said they were picking up the girl in the back seat and going to his house.  Officer asked him what was in the bag, and Defendant repeated the question.  In Officer's experience, people often repeat questions because they are trying to think of an answer, and it is an indication that "they are maybe not telling the truth."  He conceded on cross-examination that persons repeat questions if they had trouble hearing them.  Officer stated that Defendant was guarding the bag, and Defendant laughed and said he was just getting his wallet out.  Officer believed, based on training and experience, that the laughter was an indication of nervousness. Officer did not ask any questions about the Impala's registration or insurance at that time, and he did not read Defendant his *Miranda* rights.

At that point, Officer went back to the police vehicle to run records checks on the individuals

in the car; he had the information he needed to check for a valid driver's license and warrants. Instead, he put on a new pair of gloves and returned to the Impala to talk to Defendant's wife. He wanted to separate the individuals in the car and see if their stories matched up, which is pretty standard when an officer believes there may be criminal activity. The wife said that the girl in the back seat was a friend of Defendant's, that she really didn't know her, and that she was just along for the ride to pick her up. She didn't know why they were going to pick up someone that she didn't know. She did not say that they were taking her to their house, as Defendant had. Officer found the explanation odd for as late as it was, and with her being pregnant. Defendant's wife was upset, so Officer let her go stand with Defendant in the hopes that she would calm down. He did not pat her down or put her in handcuffs.

Officer then spoke with the passenger in the back seat. She said that she had contacted Defendant and his wife to pick her up and take her to the QT gas station across the street. She said she lived with her father, but he could not take her to the store. He asked her about guns, drugs or something in the car, and she said there were none that she knew of. Her tone was light, and she made faces and joked. When he asked about four different types of drugs individually, he noticed that she just shook her head when he asked about methamphetamine as opposed to her verbal answers about the other three drugs. Based on his training and experience, the difference in her response made Officer suspect that there was methamphetamine in the vehicle. He did not ask her whether they were going anywhere after the gas station. At that point, 13 minutes and 41 seconds had elapsed since Officer turned on his body camera.

Officer then went to his vehicle to run records checks, including driver's license checks and criminal histories, for each passenger. Defendant had an extensive criminal history that included

6

narcotics offenses.  Officer believed everyone was "clear" and did not have any outstanding warrants.  When he finished running the records checks, 17 minutes and 17 seconds had elapsed from the time he turned on his camera.

At that time, the back-up officer notified Officer that Defendant's wife had a protrusion in her chest area, which in Officer's experience, was a common place where females hid illegal items. Officer went to her and asked about it, and she pulled money and cards out of her bra strap and showed them to him.  She was crying, which made him believe that she was worried that Defendant was going to go away, and that something illegal was going on.  He asked her why she was crying, and she talked about CPS.  She denied that there were drugs in the car.  He asked for consent to search the car, and she said no.  Officer conceded on cross-examination that he did not have probable cause to search the Impala at that point.  Officer asked her what was in the bag on the seat, and she said it was hers and gave him consent to search it.  He then let her go back and stand in front of the squad car while he searched her bag.  There was nothing illegal in it.  Officer testified that he still had no basis to search the Impala at that point.

Officer subsequently walked around to the driver's side and looked, for about 20 to 30 seconds, in the area where Defendant was sitting.  He saw what he recognized as distribution baggies, or small ziplock bags that are used for distributing drugs.  This also led him to believe there might be drugs in the Impala.  At this point, 21 minutes and 39 seconds had passed.  He went and asked Defendant about the bag and whether he could search it.  Defendant asked if Officer would let his wife go.  Officer responded that if there was nothing illegal in the car, then everyone would be able to go.  He didn't want Defendant to think he couldn't refuse to consent to the search, but he did not specifically tell Defendant he had the right to refuse consent.  Officer did not perceive

Defendant to be bargaining consent to search the bag in return for letting his wife go.  Defendant's demeanor was the same at that point as throughout the encounter.  At that point, Officer was not going to arrest any one.  Defendant then gave consent to search the bag.  Officer did not believe that there was any confusion about which bag Defendant gave consent to search.  The exchange between Officer and Defendant lasted 62 seconds; at 22 minutes and 41 seconds, Officer went to retrieve the bag so he could search it.  When he grabbed it, the strap got caught between the seat and the center console.  He pulled on the bag, and "a gun popped out of that same area with the seat and the center console."  At that time, about 23 minutes and 25 seconds after Officer activated his camera, he told Defendant that he was under arrest for the gun.  Officer's actions and decisions were not based on any one act, but on a totality of the circumstances based on his law enforcement training and experience.

B.    **Video**

According to the time stamp on the upper right hand corner of the body cam video, the recording begins at 00:42:14, with no sound.  Officer is steering his vehicle with his left hand, and typing information into the computer mounted on the dashboard.  The sound begins at 00:42:43.  At 00:43:14, he stops the vehicle and gets out, turns on his flashlight, and walks to the driver's side of the Impala while shining the flashlight into the vehicle.  He greets the driver, Defendant, who slightly leans his head out of the open window as he turns to look at Officer over his left shoulder.  Officer introduces himself, and tells him why he stopped the vehicle, as he directs the flashlight into the vehicle and at the passenger in the back seat.  As Officer is talking, Defendant's left elbow appears to be resting inside the door on the armrest, and his left hand is on his chin or stroking it.  He appears to be leaning his left shoulder against the door while looking forward and at the ground,

8

although he briefly glances at Officer..  His right forearm is resting across the steering wheel.



Officer asks Defendant for his driver's license.  Defendant takes his right hand off of the steering wheel and turns to his right while putting his left hand on the steering wheel and seeming to lean forward on it momentarily, and his head is directed down towards the right part of his seat, where he seems to be reaching with his right hand.



He then moves his left hand down while his head remains directed towards the right part of his seat

9

for a few seconds. His hands are not visible until he turns towards the window with his wallet, and he opens it and holds it to the left side of the steering wheel, just inside the window. He pulls his identification card out of the wallet and hands it to Officer. He then closes his wallet, puts its back into what appears to be a colorful bag on his right next to the console, and zips up the bag. Defendant puts his right hand on the steering wheel and again appears to lean his left elbow on the armrest, with his hand on his chin. He explains to Officer that they just bought the car and it was not yet registered. Defendant briefly glances at Officer but does not maintain eye contact.[3]

Officer greets the passengers. Defendant states that the passenger in the front seat is his wife, and the passenger in the back identifies herself as Defendant's friend. Officer asks the passengers for identification. While the Officer is speaking to the friend in the backseat, Defendant continues to lean on the door with his left hand stroking his chin and his right hand on the steering wheel, and he is looking forward and down, but occasionally glancing at Officer. Officer then directs the flashlight towards Defendant's wife while asking her for identification, and Defendant raises his left arm and turns to the right and leans into the vehicle, out of the camera's view. His left arm comes into view, and his left hand is raised towards his face, while Officer is talking to the friend. He then rests his left arm on the window frame and looks forward and then at his wife's bag, which is open on her lap. She says she left her identification, and he looks at Officer and asks if she can give him her information. Officer asks them to wait for a second, and Defendant then turns toward the window and leans his head out slightly as he looks down, with both arms on the window. He moves his head in, but continues to lean both of his arms on the car door and look forward while his wife is conveying her information to Officer.

---

[3] At times, the camera's view is momentarily blocked by Officer's hand, arm or the flashlight.

10



Defendant glances at Officer a few times as Officer asks how long they have been married, and whether Defendant has a driver's license.  Defendant states that he has one, but not with him, and he denies that his license is suspended.  Defendant puts his left hand up near his face as if to shield his eyes from the flashlight, and then leans his head out and forward again with his arms on the window.  He turns forward and brings his hands inside the vehicle, but leaves his left elbow on the window.  He is holding a cigarette.  When Officer asks if he has a lighter, he looks at him.  Officer says he can step out in a second and light the cigarette.  At that point, the backup officer comes into the camera's view on the other side of the Impala.  Defendant puts what looks like a package of cigarettes down, and he leans forward slightly, with both hands inside the vehicle.

At 00:47:24, Officer tells Defendant that he can step out of the vehicle.  Defendant turns to his left and leans towards the console, and then he turns and opens the door as Officer shines the flashlight into the front seat. Defendant then turns to his right as if to step out, and he looks at Officer and asks if he can put the vehicle in park.



Officer responds, "Yeah, please."  Defendant turns to his right into the vehicle, puts his left hand on top of the steering wheel and leans over the console area, appearing to put his weight on his right hand while lifting up from the seat.



He then sits back down in the seat, turns to his left and gets out of the vehicle.



Officer asks him to step to the back of the vehicle. Defendant seems to ask, "Like this?" Officer again tells him to step to the back, and Defendant repeats himself. Officer then appears to take him to the back of the by the arm, as Defendant says he is lighting a cigarette. Officer tells him to relax and "go on back there." The back up officer approaches Defendant, as Officer tells him to put it down. Defendant asks if he can light a cigarette, and Officer responds, "in a minute," and tells him to set it down. He turns Defendant away from him and begins to place handcuffs on him. Defendant says that Officer cannot do that, and Officer says he can because Defendant keeps reaching in his pocket. He tells Defendant to step back as both officers pull him away from the back of the Impala towards to the front of Officer's vehicle. At 00:48:16, Officer conducts a pat down search of Defendant, removing what appears to be a lighter from Defendant's pocket during the process. Defendant asks to smoke a cigarette, and Officer responds that he will be able to in a moment.

Officer then begins to light a cigarette, as Defendant asks whether Officer will tell him what this is about. Officer says he told Defendant not to reach in his pocket, and that is why he is in handcuffs. Defendant apologizes. At 00:49:17, Officer tells Defendant he saw them go to that hotel

13

and leave 5 or 6 minutes later. He asks Defendant what their business was there, and Defendant motions toward the Impala, saying they went to get the passenger, who is his friend. Officer asks Defendant questions about how long he has known her, and why Defendant and his wife are picking her up at the hotel. At 00:50:09, Officer asks, "What's in that bag, man?," and points toward the Impala. Defendant repeats the question while looking at the ground, and then looks at Officer and says "jewelry". Defendant motions towards Officer with his chin, and as Officer removes the cigarette from Defendant's mouth, he says that Defendant was "really . . . guarding that bag." Defendant smiles and says something about Officer asking for his driver's license, and Officer tells him that he really didn't want the officers to see that bag. Officer asks whether Defendant is nervous; Defendant denies being nervous and says, "don't do this." Officer asks Defendant if he has been in trouble before, and Defendant says that he has.

At 00:51:03, Officer says, "[h]ang on one second," goes back to his squad car while removing his rubber gloves, and puts on a fresh pair. He then goes to the front passenger side of the Impala and asks Defendant's wife to step out. She is crying and rubbing her stomach, and saying that she is stressing out. Officer asks about the passenger, the purpose of the trip, and whether there are drugs in the vehicle. After she responds that the passenger is Defendant's friend, she really doesn't know her, and she didn't know why they were going to pick her up, Officer asks her to go wait by Defendant. He then goes around the vehicle to the passenger door on the driver's side.

At 00:53:45, Officer asks the friend to step out of the vehicle. Officer asks about the purpose of the trip, and she says that Defendant and his wife came to get her and take her to the nearby Quick Trip store. Officer asks her if there is anything illegal in the car, and she says she does not know of anything. He asks specifically about marihuana, cocaine, methamphetamine and heroin. She

14

shakes her head, shrugs her shoulders, and says, "not that I know of."  In response to the question about cocaine, she shakes her head while looking at Officer, and she responds similarly but with a slower head shake and raised eyebrows when asked about methamphetamine.  She shakes her head vigorously and frowns in an exaggerated manner in response to the question about heroin.  Officer asks about money, and she jokes in response about how she would not be there if there was.  Officer asks her to go wait by Defendant and his wife.

As they both walk over to them, at 00:55:17, Officer asks all three if they have Texas ID. He then goes to his vehicle, gets in, and begins to enter information into the computer.  When he gets out of the vehicle at 00:59:35, the back up officer walks over and speaks to him in a low tone. The conversation is not clearly audible.  Officer calls the wife over and asks what she has in her shirt.  She responds that it is money and her food stamp card, and she pulls them out and shows them to him before putting them back in her shirt into her bra.  She is crying, and Officer asks why she is so upset.  She says that it is because she "loves him so much" and doesn't know what to do.  She says she is stressing out because CPS will not let her see her baby, and she is trying to straighten things out.  He again asks her if there are any drugs in the car or on anybody's person, and she says no.  He asks her what is in the bag that Defendant reached into for his identification, and she said it is his bag.  She confirms that the Impala is hers and Defendant's, and Officer asks to search it, but she says no.  She is no longer crying at this point.  He asks for permission to search her bag, and she consents, saying it is the Victoria's Secret bag.  Officer asks her to go wait by Defendant at 01:02:05, while he goes to search her bag.  After Officer searches the wife's bag, he returns it to the front passenger floorboard at 01:03:40.  He walks around the front of the Impala and shines his flashlight into the driver's side, and then into the back seat.

15

At 01:04:16, Officer calls Defendant over. He is leaning his head on his wife's shoulder, and she is no longer crying. Officer asks him if the bag from which he retrieved his identification is his, and Defendant confirms that it is his bag. Officer asks whether he can search the bag, and Defendant smiles as he asks whether Officer will leave him alone and let her go. Officer asks, "let her go for what?" and says that "she is not under arrest right now." In the background, a woman's voice is heard talking and then laughing. Officer says to Defendant, "honestly, man, if there is nothing illegal, then" he'll let them all go. Defendant says they had baggies, and Officer responds that he saw the baggies. Officer again asks if he can search the bag, Defendant repeats the question, and then Officer says yes, that he just wants to search his bag. Defendant looks back at the Impala for a few seconds and then down, and then says something inaudible. Officer says, "What's that?" Defendant's response is inaudible, and Officer says, "I can grab it?" Defendant says, "you can grab it." Officer asks, "can I search it?" and Defendant says "search the bag." Officer clarifies that it is just the bag that he had his ID in, the rainbow one, and Defendant says okay. Officer repeats, "I can search it?," and Defendant is looking down as he nods yes at 01:05:08. Officer tells him to wait back over by the squad car and walks over to the Impala. He shines the light into the driver's side, but the camera's view is blocked by the flashlight as he then says, "Come on, man!" He walks back to the group and tells the back up officer at 01:05:30 to put Defendant in the car and search him, stating that there is a gun. Just over 23 minutes elapsed from the time that Officer stopped the Impala until Defendant was arrested.

## C.     Incident Report

In the Incident Report, Officer wrote that he was watching a hotel when he observed a maroon Impala arrive and then leave ten minutes later. He followed it and observed a traffic

violation.  He ran the license plate, and the return showed that the registration was expired and insurance was unconfirmed.  He then initiated a traffic stop.

When Officer made contact with Defendant, Defendant appeared to be very nervous because Officer could see his hand shaking, and he also did not make eye contact.  Defendant was difficult to understand because he was mumbling, and he put an unlit cigarette in his mouth.  When Officer asked for a driver's license, Defendant reached into a small multicolored backpack near the center console on his right side, "turning his body in an apparent attempt to cover up the contents of the bag," and removed identification, which he then handed to Officer.  Officer asked him to step out of the vehicle, and he did.  Officer then removed the passengers.  He asked Defendant's wife if he could search the vehicle and was told no, but she consented to a search of her purse.  Officer's search revealed no contraband.  Officer then asked Defendant if he could search his backpack; Defendant confirmed it was the multicolored one and gave consent to search it.  When Officer removed the bag from the seat, he saw a handgun fall onto the seat.  It appeared to have been stuffed between the console and the seat, and he believed that the bag's strap had also been stuffed there and caught the gun when he removed it.

## II. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It generally requires officers to obtain a warrant before searching or seizing an individual.  *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).  "'The government bears the burden of showing the reasonableness of a warrantless search or seizure.'" *Id*. (quoting *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005)).

17

"Traffic stops are considered seizures within the meaning of the Fourth Amendment." *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see also United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) ("This protection extends to vehicle stops and temporary detainment of a vehicle's occupants.")(citing *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)).  To analyze the legality of a traffic stop for Fourth Amendment purposes, courts apply the "two-tiered reasonable suspicion inquiry" set out in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Id.*; *see also United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (*en banc*); *United States v. Pack*, 612 F.3d 341, 349-50, *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010).  This inquiry requires courts to first determine whether the initial traffic stop was justified at its inception, and to then examine whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him or her to initiate the stop.  *See id.*; *Brigham,* 382 F.3d at 511; *Pack*, 612 F.3d at 350.

"For a traffic stop to be justified at its inception, the officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The Fourth Amendment requires only a "minimal level of objective justification for making the stop." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002).  "To find that reasonable suspicion existed to justify a stop, a court must examine the 'totality of the circumstances' in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that 'the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing.'" *Monsivais*, 848 F.3d at 357 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Here, Defendant's motion concedes that the initial traffic stop was justified because Officer "witnessed one minor traffic violation, and on that basis, could temporarily seize the Impala and its occupants to issue a citation," and that "[h]e reasonably suspected two others and was entitled to investigate those suspicions as well." (*See* doc. 24 at 7 (citing *United States v. Smith*, 506 F. App'x 319, 319-20 (5th Cir. 2013), and *United States v. Broca-Martinez*, 855 F.3d 675, 680 (5th Cir. 2017).) Officer's report and testimony reflect that he saw the Impala fail to stop behind the white line at a stop sign, and that his computer check on its license plate showed an expired registration and unconfirmed insurance.[4] According to Defendant, this allowed him to inspect Defendant's license, review the Impala's registration, determine whether it had insurance, and confirm the occupants' identities, according to the motion. (*Id.*) He argues that while Officer "followed these rules for the first four minutes of the stop," he "abandoned the valid justifications for the stop entirely" after he ordered Defendant from the vehicle. (*Id.*)

## A.  Prolonged Stop

Defendant first argues that the gun should be suppressed because Officer "clearly prolonged the stop beyond the time necessary to investigate the suspected traffic violations" in violation of his Fourth Amendment rights. (*See* doc. 24 at 7.)

As noted, under the second part of the *Terry* inquiry, "an officer's actions [after a traffic stop] must be 'reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'" *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (quoting *Andres*, 703 F.3d at 832. "An officer's subsequent actions are not reasonably related in scope to the

---

[4] The video reflects that Defendant admitted that the vehicle had no registration after Officer told him why he had been stopped.

circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate [those] circumstances . . . , unless he develops reasonable suspicion of additional criminal activity in the meantime." *Pack*, 612 F.3d at 350. While there is "no constitutional stopwatch on traffic stops," *Brigham*, 382 F.3d at 511, "[t]he stop may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed,'" *Reyes*, 963 F.3d at 487 (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "Those tasks include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 355). The officer "also may question a vehicle's occupants about the purpose and itinerary of their trip." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (citing *Pack*, 612 F.3d at 350). "The Fourth Amendment tolerates additional investigation unrelated to the safe and responsible operation of the vehicle only if that investigation does not lengthen the driver's detention or is supported by reasonable suspicion of additional criminal activity." *Reyes*, 963 F.3d at 487 (citing *Rodriguez*, 575 U.S. at 354-55). "[D]etention, not questioning, is the evil at which *Terry's* second prong is aimed." *Shabazz*, 993 F.2d at 436.

"If the officer develops reasonable suspicion of *additional* criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Andres*, 703 F.3d at 833 (*emphasis added*) (quoting *Pack*, 612 F.3d at 350) (alterations in *Andres*); *see also Reyes*, 963 F.3d at 487-88 (if the officer develops reasonable suspicion "'before the initial purpose of the stop has been fulfilled, then the detention may continue

until the new reasonable suspicion has been dispelled or confirmed'")(quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)).  "[A]n officer can ask unrelated questions that 'extend the duration of the stop' if—but only if—the officer has reasonable suspicion sufficient to support the continued detention." *Macias*, 658 F.3d at 518 (citing *Pack*, 612 F.3d at 350).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the ... seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).  The officer must be able to "articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" to satisfy the Fourth Amendment. *Chavez*, 281 F.3d at 485.  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, —— U.S. ——, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)) (alteration in *Glover*). Courts are to "look at 'the totality of the circumstances' in determining whether an officer had a particularized and objective basis for suspecting criminal activity." *Reyes*, 963 F.3d at 488 (citing *Glover*, 140 S. Ct. at 1191). "That analysis 'is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.'"  *Id.* (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)); *see also United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992)(factors that ordinarily would "constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers").  "The Supreme Court has emphasized that courts must allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the

cumulative information available to them that might well elude an untrained person.'" *Brigham*, 382

F.3d at 507 (quoting *Arvizu*, 534 U.S. at 273) (internal quotations omitted).  "Of principal relevance

in the totality of the circumstances that an officer is to consider will be the events which occurred

leading up to the . . . search, and then the decision whether these historical facts, viewed from the

standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Reyes*, 963

F3d at 488  (quoting *United States v. Glenn*, 931 F.3d 424, 429 (5th Cir.), *cert. denied*, 140 S. Ct.

563 (2019)).  "For the scope of an officer's detention to be reasonable in the light of the facts having

created the reasonable suspicion, 'each crime he investigates should, if established, be reasonably

likely to explain those facts.'" *Macias*, 658 F.3d at 520 (quoting *Pack*, 612 F.3d at 357).

In this case, Officer testified that his actions were based on the totality of the circumstances,

including his training and law enforcement experience and his experience in making arrests of

persons leaving the same hotel that Defendant had just left.  He specifically identified the facts that

supported his suspicion of additional criminal activity:

- He was patrolling the area near a hotel where illegal drug activity was known to occur, where he patrolled on a near nightly basis, and where he had previously made several drug arrests.

- He observed the Impala arrive and stay at the hotel for only five or ten minutes, which was consistent with drug activity he had seen there in the past.

- When he was speaking to Defendant after the traffic stop, Defendant would not make eye contact with him, which Officer thought was unusual.

- When asked for identification, Defendant turned to his right to retrieve it from a bag on the seat next to him in a manner that Officer interpreted as unusual and "maybe trying to keep it out of [his] view."  He noted that persons often put their wallets or purses in their laps to search for their identification, as Defendant's wife did.  After he gave Officer his identification, Defendant closed his wallet, shifted back over to the right, put it back in the bag, and turned to face Officer.

- Defendant exhibited signs of nervousness, such as mumbling, fidgeting with his

22

beard, getting a cigarette, flexing his arm, and responding to questions with what Officer interpreted as nervous laughter.

• Defendant was sort of leaning out of the window and "blading" his body towards Officer in a manner that was "not very relaxed," and one reason for "blading" could be to block view of something.

• When he opened the door to get out of the vehicle, Defendant asked Officer if he could put the car in park, and Officer found it unusual that the car was not already in park.

• Instead of getting out of the vehicle, Defendant then leaned into the Impala in a manner which "definitely got [Officer's] attention" and made Officer continue to believe that he was trying to conceal something.

• When asked what was in the bag, Defendant repeated the question. In Officer's experience, people often repeated questions when they were trying to think of an answer and were "maybe not telling the truth." Defendant laughed nervously in response to Officer's statement that he was guarding the bag.

• The three passengers gave inconsistent stories. Defendant said he and his wife were picking up his friend to go to their house, his wife said she didn't know why they were picking up Defendant's friend, and the friend said Defendant and his wife were taking her to a nearby convenience store.

• Defendant's wife was crying and upset.

• When separately asked whether four different types of drugs were in the vehicle, the passenger's response to the question about methamphetamine was a non-verbal facial expression in contrast to her verbal responses to the questions about the other three drugs.

• After he ran Defendant's criminal history, Officer saw that it was extensive and included drug offenses.

• Officer saw small ziplock distribution baggies in the Impala when conducting a visual inspection.

Officer's testimony is largely consistent with the video, and no controverting evidence was presented by Defendant, so his version of the facts is accepted to the extent that it does not clearly conflict with the video. He identified facts that are sufficiently "specific and articulable," and when

23

taken together with rational inferences from them as well as his experience (both generally and at the hotel Defendant had just left), present "a particularized and objective basis" for suspecting additional criminal activity beyond the traffic violations. Viewed from the standpoint of an objectively reasonable police officer, these facts support a reasonable suspicion of additional criminal activity that warranted Defendant's continued detention for a reasonable time while Officer investigated and attempted to dispel that suspicion. *See Brigham*, 382 F.3d at 509; *Pack*, 612 F3d at 362. The length of the detention, which lasted a total of 23 and a half minutes, and the scope of the investigation were reasonable in light of those facts. *See Pack*, 612 F3d at 362.

Defendant argues that Officer had no valid basis to expand the scope of his investigation beyond the traffic violation. He contends that the video shows that his hands were not trembling, and that despite his alleged mumbling, he and Officer were able to carry on a normal conversation. It is not evident from the video that Defendant's hands were shaking, but it shows that he did move them around to different positions, including inside the vehicle to get a cigarette and to put down the package of cigarettes. The video also reflects that Officer did ask Defendant to repeat his answer at the beginning of the encounter. Defendant also notes that nervousness is an entirely normal reaction to the traffic stop, *see Monsivais*, 848 F.3d at 359, and that avoidance of eye contact is entitled to no weight in the determination of reasonable suspicion, *see United States v. Nichols*, 142 F.3d 857, 871 (5th Cir. 1998).

The Fifth Circuit has expressly rejected this type of "divide-and-conquer approach, however, [because it] ignores 'the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances.'" *Reyes*, 963 F.3d at 489 (quoting *Lopez-Moreno*, 420 F.3d at 433). Courts may not refuse to find that a reasonable suspicion existed because

24

there is an innocent explanation for each set of circumstances; the proper inquiry is whether the entire set of circumstances, taken together, created reasonable suspicion. *Pack*, 612 F.2d at 358. In fact, in *Brigham*, the Fifth Circuit expressly noted that nervousness, avoidance of eye contact and responding to questions with questions, as in this case, were all facts that "fueled" the officer's "increasing suspicion." 382 F.3d at 508. It noted that the officer had a right to rely on his experience that these actions could indicate deception. *Id.*

Defendant next argues that the video contradicts Officer's description of the manner in which he retrieved his identification from his backpack. He agrees that under Fifth Circuit precedent, furtive movements may create reasonable suspicion, but he contends that the video shows that he simply reached across his body to take his wallet out of his backpack. The video shows Defendant put his left hand on the steering wheel while seeming to lean forward momentarily while his head is directed down towards the right part of his seat, where he seems to reach with his right hand. His right shoulder is moving and he then moves his left hand down while his head remains directed down towards the right part of his seat. From the angle of the video, from just outside the window behind the front seat, neither Defendant's face, hands nor the bag are visible. Because it only shows the back of his head and torso, the video does not necessarily contradict Officer's testimony.

In the video, when Defendant does make eye contact with Officer, he looks above and to the left of the camera, which indicates that Officer's view into the vehicle was higher and more in line with the position of the bag than that of the camera. The video therefore does not show exactly what Officer saw. It does show that after handing him his identification, Defendant placed his wallet back in the bag and zipped it up, and then turned to face Officer. Officer testified that based on his experience, persons often placed their wallets or purses in their lap to look for their identification,

as Defendant's wife did. He could reasonably have inferred, based on more than 12 years of experience, that the manner in which Defendant retrieved his identification was an attempt to shield the bag from view. The movement he describes is analogous to the types of movements which Defendant concedes may create reasonable suspicion. *See Grant*, 349 F.3d at 198 (the passenger's "fumbling around in the passenger seat" was one of the articulated fact that, under a totality of the circumstances analysis, created reasonable articulable suspicion); *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992) (the driver's movement about in his seat as if to conceal or retrieve some item was one of the facts that created reasonable suspicion).

This inference is further supported by the facts that Officer subsequently noted, and that are shown on the video. The video shows that after Defendant retrieved his identification, he returned his wallet to the bag and zipped it up immediately, and then later turned and leaned on the window frame with his back to his wife, who was speaking past him to Officer. He at times "bladed" his body on the window frame in what appears to be an awkward position, away from the bag. Finally, Defendant's movement inside the vehicle before his exit from it is striking, even to the untrained eye. He leaned to his right in the area where his backpack was located and lifted up from the seat, almost as though he was going to back out of the vehicle, before sitting back down in the seat, turning to the left, and getting out. Officer was permitted to draw on his experience and training to make inferences from and deductions about the available cumulative information that might well elude an untrained person. *See Brigham*, 382 F.3d at 507.

All of these actions occurred within the first four minutes of the traffic stop, during which Defendant concedes that Officer was justified in his actions. During this span of time, Officer saw Defendant leave a hotel known for drug activity late at night after a only few minutes, fail to make

eye contact with him when stopped, display signs of nervousness such as fidgeting with his beard and a cigarette, retrieve his identification in a manner that seemed to be an attempt to block Officer's view of the bag in which it was located, lean on the window frame with his back to his wife and "blade" his body away from the bag, ask to put the stopped vehicle in park, and then lean into the vehicle in a manner that reinforced Officer's belief that Defendant was trying to hide something from his view.  As in *Reyes*, although Defendant may have innocent explanations for each of his actions, together they gave Officer "more than a mere 'hunch' of illegal activity."  963 F.3d at 489.

Moreover, Officer articulated additional facts and observations after Defendant exited his vehicle and was handcuffed that continued to increase his reasonable suspicion of criminal activity, such as the wife's reaction to the stop, the inconsistent stories of the occupants about where they were going, the friend's reactions to the questions about specific drugs, Defendant's criminal history that included drug offenses, and the presence of distribution-type baggies in the area where Defendant had been sitting.  Officer's actions and continued investigation could be characterized as "a graduated response to emerging facts," as noted in *Brigham*.  *See* 382 F.3d at 509.  One of the emerging facts was the backup officer's observation of a bulge in the wife's shirt in an area of her chest where, in Officer's experience, illegal items were often concealed.

Based on the totality of the circumstances, including his experience, familiarity with criminal activity at the hotel Defendant visited immediately prior to the stop, and specific articulated observations during the stop that are largely supported by video, Officer has shown a particularized and objective basis for reasonably suspecting criminal activity that justified extending the duration of Defendant's detention.  His actions were not unreasonable under a totality of the circumstances, and his continued detention of Defendant while he investigated the additional criminal activity that

27

he reasonably suspected did not violate the Fourth Amendment.

**B.     Invalid Consent**

Defendant also argues that the gun he is charged with possessing should be suppressed because his consent to search his bag was invalid.  (*See* doc. 24 at 10.)

As noted, "'a warrantless search . . . is presumptively unreasonable, and it is the government's burden to bring the search within an exception to the warrant requirement.'"  *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020) (quoting *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011)).  Consent is a well-settled exception.  *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997).  To decide whether consent to search is valid, the Fifth Circuit uses a two-pronged inquiry that examines: "(1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will." *Macias*, 658 F.3d at 522-23 (citing *Jones*, 234 F.3d at 242).  "'The first prong focuses on coercion, the second on causal connection with the constitutional violation.'" *Id.* at 523 (quoting *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993)).  When consent to search follows a constitutional violation, both questions must be answered in the government's favor.  *Id.*  "'Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will.'" *Id.* (quoting *Chavez-Villarreal*, 3 F.3d at 127-28).

*1.     Coercion*

Defendant first contends that his consent to search his bag was invalid because Officer coerced him to consent.  (*See* doc. 24 at 10.)

"'The voluntariness of consent is a question of fact to be determined from a totality of the circumstances.'" *Soriano*, 976 F.3d at 455 (quoting *United States v. Santiago*, 410 F.3d 193, 199

(5th Cir. 2005)).  Courts consider six non-controlling factors to determine the voluntariness of consent: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.*  "[N]o single factor is dispositive or controlling." *Tompkins*, 130 F.3d at 121; *see also Macias*, 658 F.3d at 523.  The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Tompkins,* 130 F.3d at 121; *Macias*, 658 F.3d at 523 (quoting *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000)).

### a.    *Voluntariness of Custodial Status*

With regard to the first factor, "[v]oluntariness of custodial status turns on whether a reasonable person in the defendant's position would feel free to terminate the encounter." *Soriano*, 976 F.3d at 455 (citing *United States v. Cavitt*, 550 F3d 430, 439 (5th Cir. 2008)).  Here, Defendant was handcuffed at the time he gave consent.  A reasonable person in his position would not have felt free to leave.  In addition, the video does not show that his identification had been returned to him at the time he gave consent.  Courts have found that a reasonable person would not feel free to terminate the encounter when an officer has not returned their identification or other relevant documents to them at the time of consent.  *See id.*; *Cavitt*, 550 F.3d at 439.  Based on these circumstances, this factor weighs against a finding of voluntariness.  *See Jones*, 234 F.3d at 243 (finding that at the time he was asked for consent, the defendant was essentially locked in the patrol car, and coercion could be inferred from the officer's retention of his driver's license and rental agreement).

29

b.      *Presence of Coercive Police Procedures*

As for the second factor, the Fifth Circuit has affirmed a finding of the absence of coercive police procedures where a defendant was not initially handcuffed and there were no threats of violence or overt displays of authority. *See Tompkins*, 130 F.3d at 122. This suggests that Defendant's handcuffing was a coercive police procedure. The video does not reflect the other two coercive police procedures identified in *Tompkins*, however; there were no threats of violence or of a search warrant by Officer, or overt displays of authority. Although a back up officer arrived to assist during the traffic stop, his involvement was limited to assisting Officer in handcuffing Defendant and then standing with the occupants while Officer conducted his investigation. *See Soriano*, 976 F.3d at 456-57 & n. 1 (noting that video footage made clear that second officer was not involved in questioning the defendant, although he stood close to him and the officer who conducted the stop)(citing *United States v. Perales*, 886 F.3d 542, 548 (5th Cir. 2018) (recognizing that presence of multiple officers can be coercive but finding that the presence of a second officer who was not involved in the traffic stop was not coercive)). Nor does the video reflect other actions found to be coercive, such as shouting or drawn weapons. *See Staggers*, 961 F3d at 759 (citing *United States v. Mata*, 517 F3d 279, 291 (5th Cir. 2008)). Neither repeated questioning of a defendant about whether he has illegal substances or confronting him with untruthful statements are coercive procedures, but rather, a means of investigating in order to confirm or dispel a reasonable suspicion. *See Soriano*, 976 F.3d at 456.

Defendant contends that Officer employed trickery by "couching his order . . . to exit the vehicle as an invitation to step out and smoke an unlit cigarette," but he then began to handcuff Defendant almost immediately. (*See* doc. 24 at 11-12.) Officer testified that he decided to get

30

Defendant out of the vehicle for safety reasons because he believed that Defendant was hiding something, which could possibly be a weapon. He also testified that after Defendant stepped out of the vehicle, he was reaching into his pocket and showed "some hesitation" and tensed up when asked to step to the back of the Impala, and Officer was concerned Defendant was going to run, so he decided to handcuff him. There is no evidence of the type of trickery that the Fifth Circuit has deemed coercive. *See Soriano*, 976 F.3d at 456 (finding that untruthful representation of unanimity between officers regarding clarity of questions, along with confrontation about inconsistent statements, was not the type of trickery deemed coercive where it was meant to ensure the defendant's understanding and prompt him to answer truthfully rather than pressure him to consent to a search); *compare Cavitt*, 550 F.3d at 439 (finding that the defendant's agreement to follow the officer to a truck stop in order to get out of the rain while the officer wrote him a warning was precipitated by a possible misrepresentation because the officer had previously proposed the request to his ride-along passenger as a plan to further his desire to search the vehicle) (citing *United States v. Webster*, 750 F.2d 307, 322 (5th Cir. 1984) (finding that the defendant's agreement to ride to the police station for coffee was uninformed and did not justify a search during his subsequent detention)).

Defendant also seems to contend that his pregnant wife's crying, and his efforts to condition consent on her release, are indications of coercion. The video does show that she is crying when speaking directly to Officer, but she stopped crying when asked for consent to search the vehicle and her purse and when she was standing with Defendant. She was not crying when Officer called Defendant over to ask for consent, and a woman's laughter can be heard in the background, suggesting that her stress had ended. At no time did Officer make any threats either to her or to

Defendant about her.  Significantly, Defendant attempted to negotiate consent to search the bag in exchange for leaving him alone *and* letting his wife go.

The video reflects that Officer explained to Defendant why he was being handcuffed, and Defendant then apologized to him.  Despite the handcuffs, Defendant was allowed to smoke his cigarette and stand and talk with his wife during Officer's investigation. The video shows no other procedures that have been deemed coercive by courts, and the handcuffing has already been considered in evaluating custodial status.  For this reason, the second factor weighs in favor of voluntariness.

### c.    Extent and Level of Defendant's Cooperation

"Cooperation by the defendant is a factor favoring a finding that consent was voluntary." *See Soriano*, 976 F.3d at 457 (citing *United States v. Yeagin*, 927 F.2d 798, 801 (5th Cir. 1991)).  Here, Defendant explained that he did not have a registration for the vehicle, provided his identification, responded to Officer's questions, apologized after being told why he was being handcuffed, was relatively calm (up to the point that Officer found the gun), and agreed to a limited search of his bag only.  *See Tompkins*, 130 F.3d at 122 (noting that the defendant cooperated to the extent of providing identification and ultimately permitting the search).  He was "'more cooperative than not,'" and this factor also weighs in favor of voluntariness.  *See Soriano*, 976 F.3d at 457.

### d.    Defendant's Awareness of the Right to Refuse Consent

"An officer's failure to inform a suspect that he has a right to refuse to consent to a search militates against voluntariness," *Soriano*, 976 F.3d at 457 (citing *Shabazz*, 993 F.2d at 438-39), but it is not "determinative in and of itself," *United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002) (citing *United States v. Galberth*, 846 F.2d 983, 988 (5th Cir. 1988)); *see also Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). Here, the government concedes that Officer did not advise Defendant that he had the right to refuse consent to search his backpack, but notes that his wife refused consent to search the Impala. Her awareness of this right does not establish Defendant's awareness, however.

When Officer asked if he could search his backpack, Defendant smiled as he asked whether Officer would leave him alone and let his wife go if he consented. Officer stated that if there was nothing illegal, everyone would be free to go. He testified that he did not perceive Defendant to be bargaining consent to search the bag in return for letting his wife go, and he did not perceive a difference in Defendant's demeanor from the rest of the encounter. Officer again asked to search the bag, and Defendant repeated the question, looked back at the car for a few seconds, and then looked down. His hesitation and body language show that he was struggling to decide whether to consent to a search of his backpack, which is more consistent with awareness that he could refuse consent than a lack of awareness. His initial attempt to negotiate a search of the bag in return for leaving him alone and letting his wife go is likewise consistent with awareness of his right to refuse consent. Finally, the fact that Defendant's consent to search was limited to the backpack only, and did not include the vehicle that also belonged to him (according to him and his wife), is also consistent with an awareness.

Additionally, although not specifically argued by the government, the Fifth Circuit has "held that 'experience in the criminal justice system can offset any weight accorded to an officer's failure to advise a suspect of his right to resist a search.'" *Soriano*, 976 F.3d at 457 (citing *United States v. Ponce*, 8 F.3d 989, 998 (5th Cir. 1993)). Here, Officer testified that the computer search revealed

that Defendant had an extensive criminal history that included narcotics offenses.  Finally, the Fifth Circuit has allowed to stand a district court's conclusion that the government has met its burden on this factor when, as in this case, the defendant presented no evidence to show that he was unaware of his right to refuse consent.  *See Staggers*, 961 F.3d at 759 (citing *United States v. Freeman*, 482 F.3d 829, 833 (5th Cir. 2007)).  All of these facts offset Officer's failure to advise Defendant of his right to refuse consent, and this factor as a whole also weighs in favor of voluntariness.

e.     *Defendant's Education and Intelligence*

Although Defendant argues that he "is not a man of high-intelligence" and was enrolled in special education classes in school (doc. 24 at 12), no evidence of his education and intelligence was presented at the hearing.  The video shows that he "was responsive to Officer['s] questions and [appeared to understand] the import of the traffic stop."  *Soriano*, 976 F.3d at 458.  Nothing about his interactions with Officer reflect any reason to believe that he is of below average intelligence and education.  *See Staggers*, 961 F.3d at 759 (stating that "the record 'leads us to conclude that [the person who provided consent to search] had at least average intelligence and education'") (quoting *United States v. Zavala*, 459 F. App'x 429, 434 (5th Cir. 2012)).  As with the fourth factor, the Fifth Circuit has allowed to stand the conclusion that the government has met its burden on this factor when the defendant has presented no evidence that he is mentally deficient or was unable to exercise free will in consenting.  *See id.* (citing *Freeman*, 482 F.3d at 833).  Based on the video, this factor weighs in favor of voluntariness.

f.     *Belief that No Incriminating Evidence Will be Found*

"An awareness or belief that no incriminating evidence will be found weighs in favor of a finding of voluntariness."  *Soriano*, 976 F.3d at 458 (citing *Shabazz*, 993 F.2d at 439).  The

34

government concedes that Defendant knew the evidence would be found if he consented. (*See* doc. 25 at 16.) This concession does not appear to be supported by the video. After he gave Officer his identification, Defendant placed his wallet back in the backpack and zipped it up, instead of leaving the backpack open until he received his identification back. Before getting out of the Impala, he visibly leaned down on the right part of the seat where the backpack was located, and where the gun was ultimately found. Officer testified that when he grabbed the backpack, the strap got caught between the seat and the center console, so he pulled on the bag. A gun then popped out of the same area between the seat and console. The gun could not have fallen out of the backpack because Defendant zipped it up after putting his wallet back in. These facts support the conclusion that Defendant believed that the gun would not be found in the backpack that he agreed Officer could search, and to which his consent was limited. Finally, the Fifth Circuit has also allowed to stand a conclusion that the government has met its burden on this factor when the defendant has presented no evidence to show that he believed incriminating evidence would be found. *See Staggers*, 961 F.3d at 759 (citing *Freeman*, 482 F.3d at 833). Absent the government's concession, this factor would also weigh in favor of voluntariness. Because of that concession, however, it is weighed against a finding of voluntariness.

The issue of voluntariness is a close call, in particular because Defendant was handcuffed and not free to leave when he consented to a search of his backpack, which was compounded by Officer's failure to advise him of his right to refuse consent and the government's concession that Defendant believed that incriminating evidence would be found. Despite these facts, however, careful consideration of the entire record in light of the six relevant factors and applicable case law leads to the conclusion that the government has met its burden to show voluntariness based on the

totality of the circumstances.  Defendant was allowed to smoke and stand with his wife despite being handcuffed; no other coercive police procedures were used; he was cooperative; he attempted to negotiate consent in exchange for leaving him alone and letting his wife go; he limited the scope of his consent to search to the backpack that did not contain the firearm; he had an extensive criminal history that included narcotics offenses; he responded appropriately to Officer's questions and appeared to understand the gravity of the traffic stop; and there was no evidence on the video of his lack of awareness of the right to refuse consent, below average intelligence and education, or inability to exercise free will.  The totality of the circumstances shows that Defendant's consent to search his backpack was voluntarily and freely given.

### 2. *Independent Act of Free Will*

Defendant also argues that his consent was not valid because it was the product of an illegal detention rather than an act of free will.  (*See* doc. 24 at 12.)[5]

"To determine whether consent was an independent act of free will and, thus, broke the causal chain between the consent and the illegal detention," the Fifth Circuit has identified three relevant factors: "'1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct.'" *Macias*, 658 F.3d at 523 (quoting *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000), *abrogated in part on other grounds by Pack*, 612 F.3d 341 (internal quotations omitted)).  No single factor is

---

[5]Absent a Fourth Amendment violation, Defendant's consent to search was not unconstitutionally tainted, so the Court does not need to consider  his argument that his consent was not an independent act of free will.  *See Brigham*, 382 F.3d at 512; *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006)(noting that there was no need in *Brigham* to inquire whether consent was constitutionally tainted because no *Terry* violation was found); *United States v. Khanalizadeh*, 493 F.3d 479, 484 (5th Cir. 2007)(finding that the district court did not err by failing to consider whether the defendant's consent was an independent act of free will, given that the initial traffic stop was constitutional) (citing *Jenson*, 462 F.3d at 407).  It is addressed in an abundance of caution, however, in case the presiding judge or appellate court finds that a Fourth Amendment violation did occur.

determinative in this analysis either. *Id.* "'The absence or presence of one of these factors is not a per se indication of free will sufficient to break the causal connection between the illegality . . . and the evidence sought to be suppressed.'" *United States v. Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015) (quoting *United States v. Wilson*, 569 F.2d 392, 396 (5th Cir. 1978)).

Consideration of the first factor, temporal proximity of the illegal conduct and consent, requires determination of "when the impermissible detention came to an end." *Macias*, 658 F.3d at 524. Although "there is no strict time between illegal conduct and consent that would serve to either validate or invalidate consent," "[t]here is . . . substantial authority for the proposition that consent given within a few seconds or minutes of the violation," up to "approximately one hour between an illegal search and consent [generally] favors the defendant." *Montgomery*, 777 F.3d at 274 (citations omitted). Here, Defendant was still handcuffed and had not yet received back his identification at the time of consent, so this factor weighs in his favor if his detention of over 23 minutes was illegal. *See id.*; *see also Macias,* 658 F.3d at 524 (officer returned identification only thirty seconds before his request to search the vehicle) (citing *Jones*, 234 F.3d at 241).

The second factor, the presence of intervening circumstances, also favors Defendant for the same reasons as the first factor. *See Macias*, 658 F.3d at 524. The video does not reflect any of the types of intervening circumstances or facts that courts have found to support a finding of intervening circumstances. *See Montgomery*, 777 F.3d at 274-75 (noting that intervening circumstances could include unsolicited consent and an unsolicited invitation to search, and that reading the defendant his *Miranda* rights before a search, a criminal history, and allowing a defendant into his home, where he calmly used medication for his respiratory condition before offering consent, were facts that supported a finding of intervening circumstances) (citations omitted).

As for the third factor, Officer decided to ask Defendant to step out of the car because he reasonably suspected that Defendant was hiding something that could be a weapon based on his movements, and he subsequently decided to handcuff Defendant because he was afraid Defendant would run given the location, his hesitation and "tens[ing] up" when asked to move to the back of the vehicle, and because he reached into his pocket.  This does not constitute flagrant misconduct. *See Montgomery*, 777 F.3d at 275-76 (finding that alleged misconduct in frisking the defendant without a reasonable belief that he was armed and dangerous, or in exceeding the permissible scope of the frisk, did not rise to the level of flagrancy found to require the suppression of evidence) (citing, in part, *Jenson*, 462 F.3d at 402-03, 406 n. 7) (finding no flagrant conduct where officer prolonged valid traffic stop after the driver's licenses were cleared and reasonable suspicion was dissipated, and after then requesting and receiving consent to search the vehicle, he frisked the defendant, found weapons and arrested him)).  The video does not show that "the clear purpose of the detention was to obtain consent to search the vehicle." *United States v. Ansourian*, 487 F. App'x 155, 158 (5th Cir. 2012) (noting that the officer said he wanted to search the vehicle when he radioed for backup, but accepting the district court's finding after a hearing that the officers did not purposefully use the period of illegal detention to procure the defendant's consent to search the vehicle, and the consent was not obtained by any misrepresentations).  During the period of detention, Officer questioned the passengers, searched the wife's purse after she gave consent, investigated the bulge in her shirt, and ran computer checks on the three occupants.

Weighing the three relevant factors, the government has not shown by a preponderance of the evidence that the causal chain between any illegal detention and Defendant's consent was broken.  As a result, Defendant's consent was not the product of independent act of free will, if there

was a constitutional violation.  Because the second prong of the two-prong inquiry has not been met, there was no valid consent to search the backpack if Defendant's detention was illegal.  To the extent that a Fourth Amendment violation is found in this case, the motion to suppress should be granted, and the firearm should be suppressed.

## III.  RECOMMENDATION

The defendant's *Motion to Suppress Evidence and Request for Evidentiary Hearing*, filed May 10, 2021 (doc. 24), should be **DENIED**.  If the Court finds a Fourth Amendment violation, however, the motion should be **GRANTED**, and the firearm should be suppressed.

**SO RECOMMENDED this 19th day of August, 2021.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE